**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| |
|---|
| STATE OF FLORIDA, et al., <br><br>    *Plaintiffs*, <br><br>      v. <br><br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., <br><br>    *Defendants*. |

No. 3:24-cv-509-TKW-HTC

## DEFENDANTS' OPPOSITION TO MOTION TO INTERVENE

On July 8, 2026, the League of Women Voters and the Electronic Privacy Information Center ("EPIC") (collectively, "Movants") filed an "emergency" motion to intervene. ECF No. 48. But to the extent that Movants have any cognizable interest in this case, they knew (or should have known) of that interest over a year ago. Accordingly, the motion to intervene should be denied as untimely.

## BACKGROUND

### A.    The Creation of the SAVE System

The Systematic Alien Verification for Entitlements (SAVE) system was created by Congress in 1986, as part of the Immigration Reform and Control Act of 1986. *See* Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note). In that statute, Congress provided that DHS "shall implement a system for the verification of immigration status." *Id.* Fulfilling that statutory obligation,

today, SAVE "is an online service administered by" USCIS "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE*, https://perma.cc/5888-TH46. Over "1,200 agencies nationwide use SAVE to support their benefit eligibility and licensing determinations," and "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.* In doing so, SAVE "[i]ncorporates privacy principles and security measures into user agencies' processes and procedures." *Id.* Ultimately, however, SAVE does not "[d]etermine applicant eligibility for a specific benefit or license." *Id.* "That determination is made by the benefit issuing or licensing agency," *id.*—often, a State or local government agency.

In 1996, SAVE took on greater importance, because of two new congressional enactments. First, in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, Congress "restructured the welfare system in the United States and restricted immigrant eligibility for public benefits," thus "expanding the need for benefit-granting agencies to verify immigration status." USCIS, *About SAVE: History*, https://perma.cc/MG5B-MCZH. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, Congress placed an affirmative "[o]bligation" on what was then the INS (now, DHS)

to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

In doing so, Congress also spoke to the issue of "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

**B.     The use of SAVE for Voter Verification**

Separately, Congress also placed an affirmative legal obligation on the States: to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are maintained"). In doing so, Congress

also provided that States must establish "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(B). Congress also emphasized that the same sort of information-sharing that it was now authorizing within the federal government also applied to the States: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.

Since the mid-2000s, in carrying out these statutory obligations, States have entered into agreements with USCIS to use SAVE to confirm the citizenship or immigration status of voters. For many years, however, SAVE suffered from some significant information-technology limitations when used for this purpose. Most significantly, until recently, SAVE could not verify immigration status without a DHS-specific immigration identifier, such as an "A-Number," which most voters do not have. *See* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT. SAVE could not run searches based on other government documents, such as a Social Security number or a passport number. *See id.* SAVE could not verify any information at all of those individuals—including most U.S. citizens, born in the United States—who had never had any encounter with DHS and thus did not appear in DHS systems. *See id.* And SAVE could only accept one verification request at a time, rather than bulk requests. *See*

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

Dissatisfied with those outdated systems, between October of 2024 and April of 2025, five States sued the federal government, arguing that DHS and USCIS were violating 8 U.S.C. §§ 1373 and 1644 due to the inability of SAVE to provide meaningful responses to most of their verification requests. *See Florida v. DHS*, No. 24-cv-00509 (N.D. Fla., filed Oct. 16, 2024); *Texas v. Noem*, No. 24-cv-49 (W.D. Tex., filed Oct. 22, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio, filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa, filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind., filed Apr. 16, 2025).  This was the first-filed suit.

C.    **Improvements and Modernization of SAVE**

In his second term, President Trump has made it a priority to modernize and improve outdated government information-technology systems.  As part of those efforts, on April 22, 2025, DHS announced that it had begun "a comprehensive optimization of the [SAVE] database to ensure a single, reliable source for verifying non-citizen status nationwide."  USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M.  The update "eliminates fees for database searches, breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records, immigration timelines, and addresses." *Id.*  And on May 22, 2025, DHS announced two specific changes: (1) "[u]sers are now able to create cases using

a Social Security number (SSN) as the applicant's enumerator," and (2) "users may now create cases in bulk." *Optimizing SAVE*, *supra* at 7.  The relevant information-sharing agreement between DHS and SSA has been available on the SSA website since May 2025.  *See Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025), https://perma.cc/8SVE-SES5.  That agreement discusses data-security procedures, loss reporting, breach notifications, and other administrative safeguards.  *See id.*

When States use SAVE for purposes of verifying eligible voters, they likewise are required to enter into a written agreement with USCIS.  *See, e.g.*, USCIS, *Mem. of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025), https://perma.cc/A6LC-9CLQ.  Those agreements require procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledge all parties' obligations to comply with other applicable federal and State laws.  *See id.* at 4, 6.

The SAVE website provides detailed instructions to user agencies about how the system works.  Among other things, it specifies that, "[i]f SAVE cannot provide a response after initial verification for a case created using only a Social Security number, SAVE will close the case and instruct the user agency to submit a new case

with corrected/updated information or to include an immigration enumerator, if available." USCIS, *About SAVE: Verification Process*, https://perma.cc/49CU-XL6G. It further explains that "SAVE prohibits agencies from rejecting a voter registration or removing an individual from a voter roll based on a SAVE response until the agency has completed all SAVE-required steps." USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (updated Feb. 2, 2026), https://perma.cc/F63E-PQ87.

### D.    The *Florida* Agreement

As DHS and USCIS made significant improvements to SAVE during spring and summer of 2025, the need for continued litigation between the United States and the five States who had challenged the previous version of SAVE waned—after all, the United States had, by that time, already made the very sorts of improvements to SAVE that the Plaintiff States had sought in filing their lawsuits.

Ultimately, after nearly a year of settlement discussions, *see* ECF Nos. 19, 23, 25, 27, the United States entered into a settlement agreement with the States of Florida, Ohio, Iowa, and Indiana. On the morning of November 28, 2025, to effectuate that agreement, those States filed an amended complaint in the above-captioned lawsuit that had originally been filed by Florida alone, adding Ohio, Iowa, and Indiana as additional plaintiffs. ECF No. 29. Later that morning, Plaintiffs then filed an unopposed motion to dismiss, "subject to the Court's approval of and retention of jurisdiction to enforce the Parties' settlement agreement." ECF No. 30.

The settlement agreement was attached to the motion to dismiss, filed on the public docket.  ECF No. 30-1.

The Court did not act upon the unopposed motion to dismiss immediately. Instead, three days later, on the afternoon of December 1, 2025, the Court granted Plaintiffs' unopposed motion to dismiss, and adopted the proposed order that had been jointly agreed upon by the parties, retaining jurisdiction to enforce the settlement agreement (subject to certain procedures described in the agreement itself).  ECF No. 31.  Plaintiffs in *Ohio*, *Bird*, and *Indiana* then dismissed their suits. *Ohio* ECF No. 19; *Bird* ECF No. 23; *Indiana* ECF No. 29.

Despite their efforts—and despite general agreement on the policy issues that originally gave rise to this litigation—the United States and Texas were unable to reach an agreement.  As of this filing, the *Texas* case remains pending; the United States recently filed an (opposed) motion to dismiss on mootness grounds, which was fully briefed as of February 12, 2026.  *Texas* ECF Nos. 12, 15, 16.

**E.     The *League of Women Voters* Litigation**

Eventually, the League of Women Voters, EPIC (*i.e.*, Movants here) and a few other organizations filed a separate lawsuit *challenging* the 2025 improvements to SAVE—primarily, the move to bulk verification, and the new capability to search on Social Security Numbers (including Social Security Administration data). *See League of Women Voters v. DHS*, No. 25-cv-3501 (SLS) (D.D.C., filed Sept. 30, 2025)

That lawsuit was filed in the District of Columbia on September 30, 2025—roughly four months after the key changes to SAVE had already been announced. *LWV* Compl., ECF No. 1.  On October 7, 2025, Movants filed a motion for a preliminary injunction or for a stay under 5 U.S.C. § 705.  *LWV* ECF No. 16.  On November 17, 2025, Judge Sooknanan denied Movants' motion for preliminary relief, holding that Plaintiffs had failed to show irreparable harm.  *See League of Women Voters v. DHS*, No. 25-cv-3501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) (Sooknanan, J.).

On December 5, 2025, Defendants filed a notice, ensuring that both Judge Sooknanan and Movants were aware of the settlement in this case.  *LWV* ECF No. 59; *see also LWV* ECF No. 37 (on October 22, 2025, identifying this case by docket number in the government's first substantive filing); *LWV* ECF No. 57 (on November 21, 2025, disclosing the existence of "advanced settlement negotiations" before the settlement agreement was signed).  After an extension, *LWV* ECF No. 60, Movants filed an amended complaint on January 21, 2026.  *LWV* ECF No. 61.

In their amended complaint in the District of Columbia, Movants brought a variety of statutory and constitutional claims.  As for their requested relief, they sought not only vacatur under the APA, but also a long list of specific mandatory injunctions that would permanently return SAVE to the form it existed in before the 2025 changes.  Proposed Order, *LWV* ECF No. 66-12.

9

On June 22, 2026, the district court in *League of Women Voters* denied the government's motion for summary judgment and granted Movant's motion for summary judgment. *See League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026). As relevant here, the accompanying order "vacate[d] and set[] aside the SAVE 'modified system' described in the October 2025 Department of Homeland Security Notice of a Modified System of Records." *LWV* ECF No. 112. That order did not issue any of the injunctions that Movants had requested.

### F.   Recent Litigation Developments

After the *League of Women Voters* order, the United States took immediate steps to come into compliance with that order, including by disabling the bulk-upload and SSN search functions for all users. As a result of those steps, on June 30, the *Florida* Plaintiffs filed an emergency motion for enforcement of the settlement agreement in this case, arguing that the government's compliance with the *League of Women Voters* order had resulted in a breach of the *Florida* agreement. ECF No. 32. The United States opposed that motion. ECF No. 42. Movants filed an unopposed motion for leave to file an amicus brief on July 1, ECF No. 37, which the Court granted the next day, ECF No. 39.

On July 7, 2026, this Court granted Plaintiffs' motion, ordering the United States to "immediately comply with the court-approved settlement agreement in this case by reinstating Plaintiffs' access to the bulk-upload and SSN-search features in

10

the SAVE system." ECF No. 45. The Court also ordered that the parties file a joint status report regarding compliance on July 14, 2026. In the days since that order, the United States has taken significant steps to come into compliance, and communicated those steps to the Plaintiffs. *See* Ex. 1, July 9, 2026 Email from S. Pezzi to J. Muehlhoff; *see also* Notice, *LWV* ECF No. 125 (informing Judge Sooknanan); Joint Status Report, *LWV* ECF No. 126 (further compliance details). In particular, the United States is now restoring the ability of the *Florida* Plaintiffs (and only the *Florida* Plaintiffs) to submit bulk-upload and SSN-based searches, which had previously been disabled for all users (and remain disabled for all other users). Defendants continue to work through technical issues associated with restoring the prior functionality for the *Florida* Plaintiffs and will provide a further update to the Court on these subjects in the upcoming status report that is due on July 14, 2026.

On the evening of July 8, 2026, Movants filed an "emergency" motion to intervene in this case. ECF No. 48. On July 9, 2026, the Court ordered expedited briefing on that motion. ECF No. 49. The United States now opposes the motion.

## ARGUMENT

Whatever interest movants may have in the outcome of this litigation, they knew (or should have known) about that interest over a year ago. Accordingly, the motion to intervene should be denied as untimely.

**1.** As Movants acknowledge in their filing, "[w]hether leave to intervene is sought under section (a) or section (b) of Rule 24, the application must be timely."

11

Mot. at 11 (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263 (5th Cir. 1977));

*see also, e.g.*, *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 254 F. App'x

769, 771 (11th Cir. 2007) ("[T]imeliness of a motion to intervene is a threshold

factor that must be satisfied before the other factors should be considered.").

Ultimately, "the question whether an application for intervention is timely is largely

committed to the discretion of the district court."  *Stallworth*, 558 F.3d at 263.  In

exercising that discretion, however, courts within the Eleventh Circuit often look to

the following four factors:

> (1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before petitioning for leave to intervene; (2) the extent of the prejudice that existing parties may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest; (3) the extent of the prejudice that the would-be intervenor may suffer if denied the opportunity to intervene; and (4) the existence of unusual circumstances weighing for or against a determination of timeliness.

*Comm'r, Alabama Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1171

(11th Cir. 2019).  This four-factor analysis "applies whether intervention of right or

permissive intervention under Fed. R. Civ. P. 24."  *United States v. Jefferson Cnty.*,

720 F.2d 1511, 1516 (11th Cir. 1983).

As a general matter, "post-judgment motions to intervene are disfavored and

'looked upon with a jaundiced eye' because of their 'strong tendency to prejudice

existing parties to the litigation or to interfere substantially with the orderly process

12

of the court.'" *Fla. Key Deer v. Brown*, 232 F.R.D. 415, 418 (S.D. Fla. 2005) (quoting *United States v. U.S. Steel Corp*., 548 F.2d 1232, 1235 (11th Cir. 1977)).

**2.** This intervention motion should be denied as untimely. In particular, the motion should be denied because Movants "knew or should have known their interests in the suit well in advance of their motion to intervene." *Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc*., 272 F. App'x 817, 820 (11th Cir. 2008). And that timeliness problem is sufficiently flagrant that the other factors are immaterial.

First, Movants knew (or should have known) that the parties were engaged in active settlement negotiations as early as May 15, 2025—because the United States said so in a public filing on this docket. *See* Defs.' Third Extension Motion ¶ 4, ECF No. 19 ("The parties are currently engaged in active settlement discussions, and are hopeful that they will ultimately be able to resolve this matter without the need for further involvement from the Court."). Movants could have moved to intervene at that time. They did not.

Second, Movants knew (or should have known) that those settlement negotiations had resulted in "significant progress" by July 15, 2025—again, because the United States said so in a public filing on this docket. *See* Defs.' Fourth Extension Motion ¶ 4, ECF No. 23 ("The parties are currently engaged in active settlement discussions, and have recently made significant progress. The parties remain hopeful that they will ultimately be able to resolve this matter without the

need for further involvement from the Court."). Movants could have moved to intervene at that time. They did not.

Third, Movants knew (or should have known) that a settlement was imminent by September 11, 2025—again, because the United States said so in a public filing on this docket. *See* Defs.' Fifth Extension Motion ¶ 4, ECF No. 25. At that time, any reader of this docket would have known that the parties were "engaged in active and ongoing settlement discussions, including an in-person meeting at the Department of Justice in Washington, D.C. that was held in August, and another (virtual) follow-up meeting that was held [the previous] week." *Id.* The filing also disclosed that "Defendants sent their most recent settlement proposal to Plaintiffs . . . on Tuesday, September 9," and that "[t]he parties [were] hopeful that they will soon be able to resolve this matter without the need for further involvement from the Court." *Id.* Movants could have moved to intervene at that time. They did not.

Fourth, Movants knew (or should have known) of this case (and its current status) no later than October 22, 2025, when the United States identified it (including by docket number) in its opposition to Movants' preliminary-injunction motion on the *League of Women Voters Docket*. *See LWV* ECF No. 37 at 6 (identifying *Florida*, *Ohio*, *Iowa*, *Indiana*, and *Texas* lawsuits, and providing the docket number for each). Movants could have moved to intervene at that time. They did not.

Fifth, Movants knew (or should have known) that the parties were in "advanced settlement negotiations" no later than November 21, 2025, when the

14

United States said so on the docket in *League of Women Voters*—in a joint filing signed by Movants.  *See* Joint Scheduling Proposal, *LWV* ECF No. 57 at 1 n.1.  In that filing, Defendants identified all five cases by docket number (again), and went out of their way to "report that some of the other five cases, brought by a collection of States principally challenging DHS's compliance with 8 U.S.C. § 1373(c), are currently in advanced settlement discussions." *Id.*  Movants, for their part, stated at that time that they "do not believe that any settlement in those cases would impact the legal issues in this case." *Id.*  That prediction turned out to be wrong.  But, in any event, Movants could have moved to intervene at that time.  They did not.

Sixth, Movants knew (or should have known) about the settlement agreement in this case when it was filed on the docket in this case on the morning of November 28, 2025, ECF No. 30-1, or when this court approved it three days later, on the afternoon of December 1, 2025, ECF No. 31.  Movants could have moved to intervene at that time, or between the filing of the motion and this Court's granting of that motion three days later.  They did not.

Seventh, Movants knew (or should have known) about the settlement agreement and dismissal order here on December 5, 2025, when the United States filed a notice in *League of Women Voters* for the purpose of confirming that both Judge Sooknanan and Movants were aware of that material development.  Defs.' Notice, *LWV* ECF No. 59.  Movants could have moved to intervene at that time. They did not.

Eighth, Movants knew (or should have known) about the possibility of an adverse order in this case when Plaintiffs filed their emergency motion to enforce the settlement agreement on June 30, 2026. ECF No. 32. Movants could have moved to intervene at that time. They did not. Instead, they filed an unopposed motion for leave to file an amicus brief, ECF No. 37—a step that would have been both unnecessary and inappropriate had they actually intervened.

In short, whether calculated from last May, last week, or somewhere in between, Movants have consistently failed to take advantage of earlier opportunities to seek intervention in this case. Accordingly, because Movants "knew or should have known their interests in the suit well in advance of their motion to intervene," *Angel*, 272 F. App'x at 820, their intervention motion should be denied.

## CONCLUSION

For these reasons, the motion to intervene should be denied.

Dated: July 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

ANDREW I. WARDEN
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (Florida 1041279)
 Chief Litigation Counsel
DANIEL RIESS
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*